# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF NEW YORK

_____

GREGORY HARVEY,

                              Plaintiff,

       vs.                                        9:09-CV-154
                                                  (TJM/ATB)

DAVID HARDER, *et al.*,

                              Defendants.

_____

GREGORY HARVEY, Plaintiff *pro se*
AARON MARCUS, Asst. Broome County Atty. for Defendants

ANDREW T. BAXTER, United States Magistrate Judge

## ORDER and REPORT-RECOMMENDATION

      This matter has been referred to me for Report and Recommendation pursuant to 28 U.S.C. § 636(b) and LOCAL RULES N.D.N.Y. 72.3(c). In this civil rights amended complaint, plaintiff alleges that defendants violated his rights to due process and equal protection[1] when they kept him in "segregated housing" for approximately one month, without any disciplinary incident or hearing. (Am, Compl.; Dkt. No. 33). Plaintiff also alleges that defendant Shear improperly ordered plaintiff to be put in restraints whenever he left his cell. (*Id.*) Plaintiff seeks substantial monetary relief.

      Presently before the court is defendants' motion for summary judgment pursuant to Fed. R. Civ. P. 56. (Dkt. No. 47). Plaintiff has responded in opposition to the motion. (Dkt. No. 50). For the following reasons, this court agrees with

---

[1] The amended complaint refers only to "due process," however, the plaintiff's response to defendants' summary judgment motion mentions "equal protection." The court will consider both claims in this recommendation.

defendants and will recommend dismissal of the amended complaint.

## DISCUSSION

I.    **Facts and Procedural History**[2]

Plaintiff alleges that he was improperly placed in "segregated housing" at

Broome County Correctional Facility ("BCCF") from January 12, 2007 until he was

transferred out of the facility on February 13, 2007.  Plaintiff claims that defendants

violated his rights to due process and equal protection because they did not afford him

a hearing prior to his confinement in the Special Housing Unit ("SHU").  Plaintiff's

original complaint named only the Broome County Sheriff, David Harder. (Dkt. No.

1).  In his amended complaint, plaintiff added the names of five more defendants, who

plaintiff believes are responsible for his improper confinement: (1) Sergeant Robert E.

Buholski; (2) Sergeant Jon C. Gillette; (3) Lieutenant Wesley C. Shear; (4)

Corrections Officer ("CO") David B. Thompson; and (5) Lieutenant William Lillie.[3]

---

[2] The court must note that plaintiff has filed eight cases in the Northern District of New York, only three of which are currently pending. *Harvey v. Farber, et al.*, 9:09-CV-152 (MAD/TWD); *Harvey v. Corrections Officers 1 through 6, et al.*, 9:09-CV-154 (LEK/TWD); and this case, *Harvey v. Harder*, 9:09-CV-154 (TJM/ATB). The cases that are closed are the following: *Harvey v. Grow, et al.*, 9:09-CV-518 (GTS/RFT); *Harvey v. Sawyer, et al.*, 9:09-CV-598 (FJS/DRH); *Harvey v. Luther, et al.*, 9:09-CV-599 (DNH/GJD); *Harvey v. City of Utica Police Officers, et al.*, 9:09-CV-644 (TJM/GHL); and *Harvey v. Law*, 9:10-CV-1468 (LEK/DEP).  The court understands that at the time plaintiff filed his original complaint in this action, many of the above cases had not yet been filed; however, by the time plaintiff filed his amended complaint in March of 2011, *all* of the other cases had been filed, but plaintiff continued to list only one case on the amended complaint form. (Am. Compl. ¶ 5).

[3] Defendant Lillie has not been served in this case.  After the first attempt at service was unsuccessful for various defendants, the court reissued summonses on March 31, 2011. (Dkt. No. 34). Service on four of the five new defendants was successful, and they all join in the motion for summary judgment. Another summons for defendant Lillie was reissued on October 14, 2011, but the summons was returned "unexecuted" on October 26, 2011. (Dkt. Nos. 40, 42).  The "Process Receipt" states that defendant Lillie is no longer employed at BCCF.  Defendant Lillie has not been

Plaintiff claims that on January 12, 2007, when plaintiff was transferred from Herkimer County Correctional Facility ("HCCF"), defendant Harder "ordered his staff to wrongfully imprison and put restraints upon plaintiff by housing him illegally in segragated [sic] housing without any record of a disciplinary incident report or any record of a disciplinary hearing." (Am. Compl. ¶ 6; Facts). Plaintiff also alleges that, beginning on January 17, 2007, "restraints were put on him," and that defendant Harder and his staff violated plaintiff's Eighth Amendment right to be free from cruel and unusual punishment with their "deliberate indifference." (Am. Compl. ¶ 6; CM/ECF pp.6-7). Plaintiff states that he became paranoid "from the loss of liberty enjoyed by other prisoners." (*Id.* at p.7) Plaintiff alleges that each of the five new defendants "signed an order" wrongfully housing plaintiff in SHU; defendant Thompson signed two orders; and defendant Shear also signed an order "to place Plaintiff in restraints whenever he left his cell." (Am. Compl. ¶ 7; Causes of Action; CM/ECF pp. 6-7).

There is no dispute in this case that plaintiff was housed in "segregated housing" for the entire time that he was incarcerated in BCCF. Defendants state that plaintiff was in Administrative Segregation ("Ad Seg"), rather than *disciplinary* segregation. In support of the motion for summary judgment, each defendant has submitted an affidavit, explaining the circumstances under which plaintiff was

---

served in this action, and defense counsel requests dismissal of the case against defendant Lillie for lack of service under Fed. R. Civ. P. 4(m). (Dkt. No. 47-28; Def.s' Br. at 11) (page assigned by defense counsel to his brief, not the CM/ECF page). Because this court is recommending dismissal with prejudice, both procedurally and on the merits of this action, the court need not address lack of service, which would normally result in a dismissal without prejudice.

confined to Ad Seg for the period between January 12th and February 13th of 2007. (Dkt. Nos. 47-19-47-26).  An affidavit was submitted by Sergeant Edward J. Cermak, who is not a defendant, but states that it was he, (not defendant Gillette),[4] who reviewed the Order placing plaintiff in Ad Seg in the facility's SHU (D-Pod). (Dkt. No. 47-20; Cermak Aff. ¶ 12; Gillette Aff. ¶ 11).  Affidavits were also submitted by CO Franklin Sherman, the Classification Officer at BCCF; and Mark Smolinsky, the Jail Administrator at BCCF. (Dkt. Nos. 47-24, 47-25).

Defendants' affidavits all state that plaintiff was transferred from HCCF to BCCF on January 12, 2007.  Prior to the transfer, defendants state that, on January 11, 2007, a "'Custodial Transfer Information' sheet" was created at HCCF, evidencing plaintiff's transfer. (Buholski Aff. ¶ 2; Cermak Aff. ¶ 2; Gillette Aff. ¶ 2; Shear Aff. ¶ 2; Sherman Aff. ¶ 3; Smolinsky Aff. ¶ 5; Thompson Aff. ¶ 3).[5]  This information, prepared by Lieutenant John Coddington at HCCF, indicated that plaintiff had known mental health problems, was on medication, had been assaultive toward staff and inmates at HCCF, and had poor adjustment to confinement. (*Id.* & Ex. F)

---

[4]  Based on this admission by Sergeant Cermak, plaintiff has requested in his response to the motion for summary judgment, that the court allow plaintiff to amend his amended complaint to remove defendant Gillette as a defendant and replace him with Sergeant Cermak.  Generally, the court would allow such an amendment.  However, because the court is recommending dismissal on the merits of this case, it would be futile to add Sergeant Cermak at this time.  The court would still recommend dismissal notwithstanding the addition of Sergeant Cermak.  The court will consider his affidavit.

[5]  Many of the affidavits contain similar paragraphs regarding the background of this case.  The court will cite to the affidavit of Mark Smolinsky, Jail Administrator, for ease of citation, even though the same information is contained in other affidavits.  Mr. Smolinsky is *not* a defendant in this case, and his affidavit contains additional information that is relevant to the motion.  I will cite to other affidavits as noted for additional information that is not contained in Administrator Smolinsky's statement.

Accompanying the custodial transfer information, was a letter from HCCF Lieutenant Coddington, further explaining that plaintiff had an "extensive psychiatric history"; had been assaultive toward staff at HCCF; had very long fingernails, which he refused to cut and had threatened to use as weapons against the staff; had a long history of threat-related activity, including threats to the President of the United States;[6] had been housed in HCCF Ad Seg due to continued outbursts and threats toward staff; had not been housed in general population due to unstable behavior and continued to be housed "alone"; was very paranoid, and was subject to "drastic mood swings." (Smolinsky Aff. ¶ 6 & Ex. G).  The court notes that while incarcerated in HCCF, on October 8, 2006, plaintiff was notified that his "classification level" was "Maximum."[7] (Def.s' Ex. D).

Plaintiff arrived at BCCF on Friday, January 12, 2007 at approximately 12:49 p.m. (*Id.* ¶ 7).  He was screened by CO Joe Spaziano, who noted that the plaintiff had a "chronic psychiatric history with mental health treatment" and referred him to the forensic unit for evaluation. (*Id.*)   Plaintiff was taken to the Ad Seg area of the

---

[6] Defendants have also filed the June 6, 2006 letter of Timothy M. Kirk, Resident Agent in Charge of the Syracuse office of the United States Secret Service. (Def.s' Ex. B).  The letter requests that the Secret Service be notified in the event the plaintiff was released from custody for any reason, due to plaintiff's long history of threat-related activity. (*Id.*)  The reason for this request was so that, if plaintiff were released, the Secret Service could assess whether he posed a danger to "any of our protectees." (*Id.*)

[7] Plaintiff was incarcerated in HCCF, pending his prosecution for First Degree Rape; Third Degree Assault; Second Degree Unlawful Imprisonment; and Criminal Mischief. (*See* Def.s' Ex. E; Herkimer County Court commitment, dated October 30, 2006 – indicating no bail pending trial). Plaintiff was clearly incarcerated in HFFC prior to October 30th because his classification notice is dated October 8, 2006. (Def.s' Ex. D).

forensic/medical unit at 5:29 p.m. on January 12.  Until that time, plaintiff had been

housed in cell number 5 of the "admissions unit," where all inmates are housed as part

of the facility's admission procedures.[8] (*Id.* & Def.s' Ex.H; Housing History Sheet).

The forensic referral sheet is Defendants' Exhibit I.  On January 14, 2007, plaintiff

was cleared by forensics, medical, and corrections to leave the medical unit, and he

was then taken to A-Pod, another housing unit used for classification purposes. (*Id.*

¶ 15 & Def.s' Ex. H).  CO Sherman is the facility's Classification Officer, and was

charged with completing plaintiff's classification. (Sherman Aff. ¶ 2).

Prior to the completion of plaintiff's classification, on January 17, 2007, there

was an incident in A-Pod, in which plaintiff allegedly directed threats toward the

President of the United States as well as other individuals. (Smolinsky Aff. ¶ 16;

Sherman Aff. ¶ 8).  Because of this incident, plaintiff was returned to the medical unit

at 2:00 p.m. on January 17th. (*Id.* & Def.s' Ex. H).  Another Ad Seg order was drafted

by CO Thompson, who noted that plaintiff was being admitted to Ad Seg as part of

the facility admission procedure, but also noted that the staff perceived a serious threat

to the inmate's safety, although he had not requested protection. (Shear Aff. ¶ 10 &

Def.s' Ex. M).  Sergeant Cermak reviewed the Order and directed plaintiff's

---

[8] An Ad Seg Order was drafted on January 12, 2007 by defendant Thompson. (Def.s' Ex. J).
There were three reasons marked with an "X" for why plaintiff was being placed in Ad Seg.  The first
reason was due to "facility admission procedures."  The second and third reasons were that the staff
perceived a serious threat to the inmate's safety (although no request for protection had been made)
and the inmate was exhibiting unusual behavior and could threaten to, or cause injury to himself or
others. (*Id.* & Buholski Aff. ¶ 8).  Defendant Buholski reviewed the order and placed plaintiff in Ad
Seg within the medical unit. (Buholski Aff. ¶ 10).  The order was approved by defendant Lillie. (*Id.* &
Def.s' Ex. J).

placement in Ad Seg in SHU. (Shear Aff. ¶ 12).  At the same time, defendant Shear states that he signed a "Restraint Order" which meant that plaintiff would have a "two officer escort" anytime that he was out of his cell. (Shear Aff. ¶ 13).  Defendant Shear states that "[n]o physical restraints, e.g. handcuffs, shackles, etc., were made part of this Order, or placed on the plaintiff." (*Id.*).  When plaintiff was released from the medical unit on January 18, 2007 he, was placed in Ad Seg in D-Pod, the SHU of BCCF to finish out his classification period.[9] (*Id.*)  Defendant Shear states that he had no control over plaintiff's ultimate classification. (Shear Aff. ¶ 16).

Plaintiff's classification was completed on Friday, January 19, 2007.  He was determined to be a "maximum" security inmate, and his assignment to D-Pod was continued. (*Id.* ¶ 18).  CO Sherman states that he conducted the classification pursuant to the facility's "Classification of Inmates" and the "Special Security Classification" policy. (Sherman Aff. ¶ 9).  The "Special Security Classification" policy allows the facility to assign inmates to SHU if they have exhibited violent behavior during periods of incarceration. (Sherman Aff. ¶ 10). CO Sherman states that in making his classification determination, he considered the transfer papers sent by HCCF.  In addition, he noted that plaintiff's current charges included Rape in the first and second degree, both violent felonies; he had exhibited assaultive behavior at HCCF; had an extensive psychiatric history; had a history of substance abuse; and had threatened the President of the United States. (Sherman Aff. ¶ 10).  CO Sherman used a

---

[9] Defendant Shear states that inmates may be placed in D-Pod without a hearing for reasons other than disciplinary. (Shear Aff. ¶ 15).

"Classification Point Scale" and determined that plaintiff was a "maximum" security inmate, not eligible for general population. (*Id.* ¶ 11). CO Sherman states that this classification was not made for punitive reasons, but for the safety and the security of the facility, its staff, and other inmates. (*Id.*) Plaintiff was notified of his classification on Monday, January 22, 2007. (Smolinsky Aff. ¶ 19).

Plaintiff was transferred out of BCCF on February 13, 2007. (Def.s' Ex. H). Defendants do not dispute that plaintiff was confined in "segregated housing" for his entire stay at BCCF.

## II.   **Summary Judgment**

Summary judgment may be granted when the moving party carries its burden of showing the absence of a genuine issue of material fact. Fed. R. Civ. P. 56; *Thompson v. Gjivoje*, 896 F.2d 716, 720 (2d Cir. 1990). "Only disputes over facts that might affect the outcome of the suit under governing law will properly preclude summary judgment." *Salahuddin v. Coughlin*, 674 F. Supp. 1048, 1052 (S.D.N.Y. 1987) (citation omitted). A dispute about a genuine issue of material fact exists if the evidence is such that "a reasonable [fact finder] could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In meeting its burden, the party moving for summary judgment bears the initial responsibility of informing the court of the basis for the motion and identifying the portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986);

8

Fed. R. Civ. P. 56 (c)(1)(A).  If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial.  *Salahuddin v. Goord*, 467 F.3d 263, 272-73 (2d Cir. 2006).  In determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant.  *See United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).  However, when the moving party has met its burden, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 247-48.

## III.   <u>Exhaustion of Administrative Remedies</u>

### A.   **Legal Standards**

The Prison Litigation Reform Act, (PLRA), 42 U.S.C. §1997e(a), requires an inmate to exhaust all available administrative remedies prior to bringing a federal civil rights action.  This requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and regardless of the subject matter of the claim.  *See Giano v. Goord*, 380 F.3d 670, 675-76 (2d Cir. 2004) (citing *Porter v. Nussle,* 534 U.S. 516, 532 (2002) (exhaustion requirement applies, *inter alia*, to excessive force claims).  Inmates must exhaust their administrative remedies even if they are seeking only money damages that are not available in prison administrative proceedings.  *Id.* at 675.

The failure to exhaust is an affirmative defense that must be raised by the

defendants.  *Jones v. Bock*, 549 U.S. 199, 216 (2007); *Johnson v. Testman*, 380 F.3d 691, 695 (2d Cir. 2004).  As an affirmative defense, it is the defendants' burden to establish that plaintiff failed to meet the exhaustion requirements.  *See, e.g, Key v. Toussaint*, 660 F. Supp. 2d 518, 523 (S.D.N.Y. 2009) (citations omitted).

In order to properly exhaust an inmate's administrative remedies, he must complete the administrative review process in accordance with the applicable state rules.  *Jones v. Bock*, 549 U.S. at 218-19 (citing *Woodford v. Ngo*, 548 U.S. 81 (2006)).  In *Woodford*, the Court held that "proper" exhaustion means that the inmate must complete the administrative review process in accordance with the applicable procedural rules, including deadlines, as a prerequisite to bringing suit in federal court.  548 U.S. at 90-103.

Generally, exhaustion of administrative remedies involves utilizing the facility's grievance process, however, when an inmate's federal claims arise directly out of a disciplinary or administrative segregation hearing or confinement, he exhausts his administrative remedies by presenting his objections in the administrative appeals process. *Sweet v. Wende Correctional Facility*, 514 F. Supp. 2d 411, 413 (W.D.N.Y. 2007) (citing *Rosales v. Bennett*, 297 F. Supp. 2d 637, 639 (W.D.N.Y. 2004) (discussing the difference between the grievance process and the administrative appeals process for disciplinary or administrative segregation appeals).

The Second Circuit developed a "three part inquiry" to determine whether an inmate has fulfilled the PLRA exhaustion requirement.  *See Brownell v. Krom*, 446 F.3d 305, 311-12 (2d Cir. 2006) (citing *Hemphill v. State of New York*, 380 F.3d 680,

686 (2d Cir. 2004)).  The inquiry asks (1) whether the administrative remedies were available to the inmate; (2) whether defendants' own actions inhibiting exhaustion estops them from raising the defense; and (3) whether "special circumstances" justify the inmate's failure to comply with the exhaustion requirement. *Id.*

### B.    Application

Plaintiff in this case did not challenge his classification or the administrative segregation decision.  In his response to the summary judgment motion, plaintiff argues that he asked a corrections officer about challenging the decision. (Pl.'s Br. at 14).  The corrections officer told plaintiff that BCCF did not have a grievance committee, "you write a sergeant if that doesn't work you write a lieutenant." (*Id.*) Plaintiff claims that he wrote to both a sergeant and a lieutenant, who told plaintiff that he "is on administrative segregation and there is nothing anyone can do about it." (*Id.*)  In support of his argument, plaintiff cites Jail Administrator Smolinsky's affidavit, which confirms that an administrative segregation decision is not "grievable." (*Id.* & Smolinsky Aff. ¶ 21).

Plaintiff may be attempting to claim that the officers prevented him from challenging the decision by "misleading" him about the proper procedural vehicle for the challenge.  The corrections officer who told plaintiff that the decision was not grievable was not misleading.  While defendants agree that an administrative segregation decision is not subject to the "grievance" process, the defendants assert that the Ad Seg decision is subject to challenge by appealing to the Facility Administrator. (Def.s' Ex. P).  Defendants' Exhibit P is a page from the Inmate

11

Handbook, specifically referencing "Administrative Segregation/Protective Custody." The handbook states that "[y]ou have the option to appeal administrative segregation decisions to the Facility Administrator." (*Id.*)

Plaintiff in this case concedes that he did not appeal to the Facility Administrator when he states that he wrote to a sergeant and a lieutenant. There is no indication, and he does not allege, that he was not given an inmate handbook. The "corrections officer" was correct in telling plaintiff that an administrative segregation determination was not grievable because the proper method of appeal is through the Jail Administrator.

The court understands that plaintiff's incarceration at BCCF was quite short, and one of the exceptions noted above involves whether the administrative remedies were actually "available" to the plaintiff. The administrative segregation decision was ultimately made on January 19, 2007, and plaintiff was transferred to another facility on February 13, 2007. It is unclear how long it would have taken to challenge the classification. There may have been very little time to appeal the decision. It has been held that transfer to other custody does not eliminate the plaintiff's duty to exhaust his administrative remedies, "at least where an inmate has sufficient time to pursue administrative remedies in the facility where the incident complained of took place." *Flowers v. City of New York*, 668 F. Supp. 2d 574, 578 (S.D.N.Y. 2009). If there were insufficient time to appeal, an exception to the exhaustion requirement might be available to plaintiff. While, the court could recommend dismissal for failure to exhaust, because the case may also be dismissed on the merits, and there could be an

argument that plaintiff did not have sufficient time to appeal the decision, I will not recommend dismissing the action based solely upon plaintiff's failure to exhaust administrative remedies.

## IV.  **Due Process**

### A.    **Legal Standards**

In order to begin a due process analysis, the court determines whether plaintiff had a protected liberty interest in remaining free from the confinement that he challenges and then determines whether the defendants deprived plaintiff of that liberty interest without due process. *Giano v. Selsky*, 238 F.3d 223, 225 (2d Cir. 2001); *Bedoya v. Coughlin*, 91 F.3d 349, 351 (2d Cir. 1996).  In *Sandin v. Conner*, the Supreme Court held that although states may still create liberty interests protected by due process, "these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force . . . , nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 483-84 (1995).

The Second Circuit has explicitly avoided a bright line rule that a certain period of  confinement in a segregated housing unit ("SHU") automatically gives rise to due process protection.  *See Sims v. Artuz*, 230 F.3d 14, 23 (2d Cir. 2000); *Colon v. Howard*, 215 F.3d 227, 234 (2d Cir. 2000).  Instead, cases in this circuit have created guidelines for use by district courts in determining whether a prisoner's liberty interest was infringed.  *Palmer v. Richards*, 364 F.3d 60, 64-66 (2d Cir. 2004).  A confinement

longer than an intermediate one, and under "normal SHU conditions" is "a sufficient departure from the ordinary incidents of prison life to require procedural due process protections under *Sandin*." *Colon v. Howard*, 215 F.3d at 231 (finding that a prisoner's liberty interest was infringed by 305-day confinement).  Shorter confinements under normal SHU conditions may not implicate a prisoner's liberty interest.

"SHU confinements of fewer than 101 days could constitute atypical and significant hardships if the conditions were more severe than the normal SHU conditions . . . or a more fully developed record showed that even relatively brief confinements under normal SHU conditions were, in fact, atypical." *Palmer v. Richards*, 364 F.3d at 65 (citations omitted).  In the absence of a detailed factual record, cases in this Circuit typically affirm dismissal of due process claims where the period of time spent in SHU was short–*e.g.*, 30 days–and there was no indication that the plaintiff endured unusual SHU conditions.  *Id*. at 65-66 (collecting cases). *See also Arce v. Walker*, 139 F.3d 329, 334-35 (2d Cir. 1998) (the *Sandin* analysis is properly applied to determine whether non-punitive, administrative segregation implicates a state-created liberty interest).

## B.    Application

Plaintiff was in Ad Seg at BCCF from January 12, 2007 until February 13, 2007, a total of 32 days.  The first eleven days,[10] however, were spent in Ad Seg due

---

[10] January 12, 2007 until January 22, 2007 (counting the first day that he was brought to BCCF as "one" and the day the he was notified of his classification).

14

to the admissions/classification procedure at the facility.  New York regulations governing county jails provide that the chief administrative officer of each facility shall "establish, implement and maintain a formal and objective system for the consistent classification of all inmates." N.Y. COMP. CODES R. & REGS. tit. 9, § 7013.1 (NYCRR)).  The regulations are quite detailed and provide specific requirements for such policies and procedures. *Id.* 9 NYCRR §§ 7013.1- 7013.9.

In accordance with these regulations, BCCF policy provides that, upon transfer into the facility, all inmates must go through initial screening and classification procedures. (Def.s' Ex. N; Broome County Sheriff's Correction Division Policy Statement).  The policy statement provides that "[u]pon completion of the initial screening and risk assessment the inmate will be placed in Ad Seg for classification." (*Id.* ¶ 3).  Classification may last up to five business days.[11] (*Id.*)  If records are not available, the Jail Administrator may extend the classification time to ten business days.

The policy statement also provides detailed factors that the classification officer must consider when determining how to classify an inmate for housing purposes. (*Id.* ¶ 6(a)-6(j)).  Those factors include criminal history; propensity for victimization or violence; history of medical or mental illness; history of hostile relationships with other inmates; and any other information that "may affect the safety and welfare of the

---

[11] Although it appears that the defendants complied with state regulations, providing for particular time limits, the violation of a state law or regulation alone would not necessarily rise to the level of a constitutional violation. *Dixon v. Goord*, 224 F. Supp. 2d 739, 744-45 (S.D.N.Y.  2002). *See Russell v. Coughlin*, 910 F.2d 75, 78 n.1 (2d Cir. 1990)).

inmate or facility staff." (*Id.*)  After the primary classification interview is completed, the interviewing officer recommends appropriate housing for the inmate. (*Id.* ¶ 10). This paragraph also provides a procedure for challenges to primary housing assignments, and any changes in primary housing relating to custody level will be discussed with the inmate by the classification officer and tour supervisor. (*Id.* ¶ 10(b), 10(c)).  The classification officer competes a "Classification Sheet," containing a numerical value assigned to the various factors considered. (Def.s' Ex. O).

"The [Supreme] Court has counseled judicial restraint in the federal courts' review of prison policy and administration, noting that 'courts are ill equipped to deal with the increasingly urgent problems of prison administration and reform.' " *Giano v. Senkowski*, 54 F.3d 1050, 1053 (2d Cir.1995) (quoting *Turner v. Safely*, 482 U.S. 78, 84 (1987)).  The overarching consideration is that a prison regulation infringing on an inmate's constitutional rights is valid so long as the regulation is "reasonably related to the legitimate penological interests." *Turner v. Safely*, 482 U.S. at 89.  In *Turner*, the Supreme Court held that the court should determine whether the government objective is legitimate and neutral, and then whether there is a valid, rational connection between the prison regulation or the official action and the legitimate governmental interest that justifies that action. *Id.*  Finally, the court determines whether there are alternative means for the inmate to exercise that constitutional right. *Id.* at 90.

In this case, the regulations cited above, together with the policy of allowing temporary segregation of  inmates upon transfer into a facility are unquestionably

related to the safety and security of the facility.  Until an inmate is screened for prior violence; propensity for victimization; possible enemies; behavior; and adjustment, the facility administrators have no way of knowing where the best place to house the inmate will be.  Thus, a short classification period in administrative segregation in order to complete this objective is a completely reasonable restriction on an inmate's liberty.  The regulations provide for notice to the inmate and for a challenge to the classification.  Thus, the regulations are valid under *Turner*, and no due process right is violated.[12]

As shown by the plaintiff's housing history report, he spent part of his classification time in the mental health area of the medical unit. (Def.'s Ex. H). Although he complains that the administrative segregation damaged his mental health and that defendants were deliberately indifferent to his mental condition, it appears that the defendants were very concerned about his mental condition, and according to his housing record, placed him in the medical unit three times prior to his final classification.[13]  Defendants could not ignore the transfer papers indicating that

---

[12] The court would also point out that the regulations do not violate equal protection because all inmates are subject to the same regulations governing classification.  Plaintiff does not mention equal protection in his amended complaint, however, in his response the motion for summary judgment, he mentions equal protection for the first time.  Even assuming that plaintiff could raise a new claim in his response, this claim has no merit.  In order to state a claim for an equal protection violation, plaintiff would have to allege that other similarly situated inmates were treated differently that he was. *See Giano v. Senkowski*, 54 F.3d 1050, 1057 (2d Cir. 1995) (citing *Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985) (the Equal Protection Clause provides that the government shall treat all similarly-situated people alike).  Plaintiff in this case has not alleged that any other inmates, similarly situated to plaintiff,  were treated differently regarding classification.

[13] Plaintiff's own exhibits show that on January 19, 2007, plaintiff was brought back to the medical unit for a physical problem, unrelated to his mental status. (Pl.'s Ex. F).  The exhibit also shows that the progress note for January 18, 2007 states that the inmate was "seen and cleared by

plaintiff was a safety risk.[14]  They could not ignore plaintiff's unusual behavior and statements to the screening officer, and the progress notes written during his stay in the medical unit show that the concern for his mental health was justified.[15] (Def.s' Ex. L).

In addition, plaintiff's relatively brief Ad Seg placement did not implicate a liberty interest under *Sandin*.  Plaintiff's classification was completed on Friday January 19, 2007, and he was notified of his classification on Monday January 22, 2007, one business day after the determination was made.[16]  He was entitled to a review of this classification, but did not take the opportunity to challenge it.  Plaintiff

---

forensics today. [L]eft unit for general population." *Id.*  Plaintiff argues that Dr. Rahmon "increased his medication and cleared him for general population on January 14th. (Pl.'s Br. at 7).  Plaintiff cites his Exhibit B as support for this, however, Exhibit B only states that Dr. Rahmon increased plaintiff's medication.  Exhibit D is the exhibit to which plaintiff may be referring, however, the note only states that plaintiff left the unit for general population on January 18th , not that plaintiff was "cleared" for general population.  In any event, plaintiff was still in his classification period on January 14th and could not have gone back to general population because his classification was not completed until January 19th.

[14] As part of plaintiff's "equal protection" claim, he argues that the defendants cannot "prove" that they ordered other inmates into Ad Seg, based upon letters from another county.  The burden is on plaintiff to show that he was treated differently than other "similarly situated" inmates.  He makes absolutely no claim that other inmates who had such a history of violence and threats were treated differently and makes no claim that other inmates were not placed in Ad Seg as part of the admission/classification procedures.

[15] On January 14, 2007, the progress notes indicate that Dr. Rahmon was "in to see inmate." (Def.s' Ex. H).  The note states that plaintiff's speech was "rushed," his thoughts were racing, he stated that he was a producer from Los Angeles, who spoke to a Fox news reporter about "the CIA issues," and "spoke to himself "most of the day." (*Id.*)  On January 17, 2007, plaintiff was involved in an incident whereby plaintiff allegedly threatened the President of the United States, resulting in his second transfer to the mental health unit.  Based upon plaintiff's history and behavior, he cannot seriously argue that defendants had no reason to be concerned about the security of the facility.

[16] The New York Regulations provide for notice of the classification determination in "one business day" after the determination is made. 9 NYCRR § 7013.8(f).

18

spent the last 21 days of his stay at BCCF in Ad Seg.  Based on *Sandin*, a period of 30 days segregation does not create a liberty interest, particularly when plaintiff has not made any assertion that the conditions of confinement (other than the separation from other inmates) was in any way atypical or significant.  Even if the court were to count the entire time that plaintiff was in administrative segregation (32 days), he still would not have had a liberty interest that is protected by due process.[17]

Finally, even if plaintiff had a liberty interest, he received all the process he was due.  It is clear that his confinement was administrative, not disciplinary.  Plaintiff confuses the two types of confinement.  He continues to argue that he was entitled to notice of "charges."  There were no "charges" of which to receive notice.  Instead, he got notice of the *classification determination* and an opportunity to challenge the determination as required by the regulations involving classification and housing assignments.  The fact that he did not challenge the determination does not change the result.  Thus, for all of the above procedural and substantive reasons, plaintiff's due process claim may be dismissed.

---

[17] *See, e.g., Brown v. Graham*, 9:07-CV-1353 (FJS/ATB), 2010 WL 6428251, at *9 (N.D.N.Y. Mar. 30, 2010) ("The federal district courts in New York, applying *Sandin*, have been consistent in holding that terms of SHU or "keeplock" of approximately 30 days or less do not implicate a liberty interest protected by the Due Process clause, even in the absence of detailed factual development regarding the conditions of confinement.") (Report-Recommendation), adopted, 2011 WL 1213482 (N.D.N.Y. Mar. 31, 2011); *Rivera v. Goord*, 9:05-CV-1379, 2008 WL 5378372 at *2-*3 (N.D.N.Y. Dec. 22, 2008) (granting summary judgment on the issue that 40 days in room confinement did not constitute a cognizable liberty deprivation under *Sandin*); *Smith v. Taylor*, 149 F. App'x 12, 2005 WL 2019547 at *1 (2d Cir. 2005) (affirming grant of summary judgment dismissing plaintiff's claims of defects in an administrative hearing that resulted in his disciplinary confinement for 45 days in the SHU; plaintiff did not offer evidence that his confinement was more onerous that those generally present in the SHU and thus did not have a protected liberty interest in avoiding the 45-day confinement).

## V.    Conditions of Confinement

Plaintiff hints that certain of his conditions of confinement were unconstitutional.  Plaintiff states that defendants were deliberately indifferent to his mental health by keeping him in "isolation."  Plaintiff also states that defendants issued a "restraint order," and he was placed in restraints whenever he left the cell.

### A.    Medical Care

#### 1.    Legal Standards

The defendants never actually mention the date of plaintiff's conviction.  The reason the court mentions this is simply to clarify the standard under which conditions of confinement are analyzed.  Allegations of mistreatment of pretrial detainees in state custody are brought under the Due Process Clause of the Fourteenth Amendment.  *See Caiozzo v. Korman*, 581 F.3d 63, 69 (2d Cir. 2009).  It has been held that because a pretrial detainee has not been "convicted," the proper inquiry is whether the conditions of confinement amount to punishment under the Due Process Clause, not whether the "punishment" is cruel and unusual under the Eighth Amendment.  *See Bell v. Wolfish*, 441 U.S. 520, 535 n.16 (1979) (contrasting sentenced prisoners with pretrial detainees).  Sentenced prisoners are protected by the Eighth Amendment prohibition against cruel and unusual punishment.  However, the same standard applies to claims of deliberate indifference to a serious threat to the health or safety of a person in custody, regardless of whether they are brought under the Eighth Amendment, relating to convicted prisoners, or under the Fourteenth Amendment for

pretrial detainees.[18]  *See Caiozzo v. Korman*, 581 F.3d at 72.  Thus, the date of

plaintiff's conviction is not relevant to any discussion because the standard would be

the same whether plaintiff were still a pretrial detainee or whether he had been

convicted of the charges.

In order to state a claim based on constitutionally inadequate medical treatment,

plaintiffs must allege "acts or omissions sufficiently harmful to evidence deliberate

indifference to serious medical needs."  *Estelle v. Gamble*, 429 U.S. at 106.  There are

two elements to the deliberate indifference standard.  *Smith v. Carpenter*, 316 F.3d

178, 183–84 (2d Cir. 2003).  The first element is objective and measures the severity

of the deprivation, while the second element is subjective and ensures that the

defendant acted with a sufficiently culpable state of mind.  *Id.* at 184 (citing *inter alia*

*Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998)).

## 2.    Application

Plaintiff in this case claims that the isolation made him depressed and harmed

his mental health.  However, plaintiff spent several days in the mental health unit, and

was examined by Dr. Rahmon, according to the progress notes submitted by both

plaintiff and defendants. (Def.s' Ex. L).  Plaintiff was monitored and his medications

were regulated.  There is absolutely no indication that the defendants, none of whom

are medical personnel, were deliberately indifferent to plaintiff's medical needs,

---

[18] Because the due process rights of pretrial detainees are "at least as great as the Eighth
Amendment protections available to a convicted prisoner," and the same standard applies, cases cited
that refer to the Eighth Amendment are thus applicable to the conditions of confinement claims of a
pretrial detainee.  *Revere v. Mass Gen. Hosp.*, 463 U.S. 239, 244 (1983).

because it is clear that, when a concern arose regarding plaintiff's mental health, he was transferred to the medical unit for observation.  Plaintiff's conclusory allegation that the "isolation" made his mental status worse is baseless.

### B.   Restraints

#### 1.   Legal Standards

In order to show that conditions of confinement violate the Eighth Amendment, the plaintiff must demonstrate that the conditions result in an "unquestioned and serious deprivation of basic human needs," and that defendants imposed those conditions with deliberate indifference. *Jolly v. Coughlin*, 76 F.3d 468, 480 (2d Cir. 1996) (citing *Wilson v. Seiter*, 501 U.S. 294, 297 (1991); *Whitley v. Albers*, 475 U.S. 312, 319-20 (1986); *Anderson v. Coughlin*, 757 F.2d 33, 35 (2d Cir. 1985)).  The placement of restraints such as handcuffs on an inmate does not, by itself, amount to excessive force or cruel and unusual punishment. *See Bridgeforth v. County of Rensselaer*, No. 1:08-CV-779, 2012 WL 2873361, at *6 (N.D.N.Y. July 12, 2012) (absent some allegation beyond forceful cuffing, the claim against defendant was insufficient as a matter of law).

In this case, defendant Shear states that he did sign a "Restraint Order," but the order only called for plaintiff to have a two-officer escort or "double team" anytime that he left his cell. (Shear Aff. ¶ 13).  Defendant Shear further states that "[n]o physical restraints" such as handcuffs or shackles were made a part of the order, "or placed on plaintiff." (*Id.*)  Plaintiff himself submits the Order in question, and it supports defendant Shear's affirmation. (Pl.'s Ex. C; Dkt. No. 50-1 at 6).  The order is

22

signed by defendant Shear.  Although the typewritten portion of the order states that, due to plaintiff's involvement in the January 17th incident, he would be placed in "full restraints" when he left the housing unit for a period of seven days, above the typewritten material, is a handwritten note by defendant Shear that reads: "Double Team only." (*Id.*)  The order was reviewed and continued on two occasions: "1/26/07 . . . 2/2/07." (*Id.*)

Plaintiff's own exhibits support defendant Shear's statement that no physical restraints were placed on plaintiff. (Pl.'s Ex. C, G).  The "restraint" only involved assigning two officers to plaintiff when he left the housing unit.  This order does not come anywhere near the level of a constitutional violation, particularly given plaintiff's behavior during the time in question.  Thus, to the extent that plaintiff's amended complaint can be read as alleging an Eighth Amendment or Substantive Due Process claim regarding his conditions of confinement, it may be dismissed.[19]

**WHEREFORE**, based on the findings above, it is

**RECOMMENDED**, that defendants' motion for summary judgment (Dkt. No. 47) be **GRANTED**, and plaintiff's amended complaint be **DISMISSED IN ITS ENTIRETY AS AGAINST ALL DEFENDANTS**, and it is further

---

[19] Defendant Harder also argues that he had no contact with plaintiff and bore no personal responsibility for his housing assignment or any other problem that plaintiff might have had at BCCF. (Harder Aff. ¶ 2).  Because the court is recommending dismissal on the merits and on procedural grounds, defendant Harder's involvement is not critical to the court's recommendation.  The court would just note that personal involvement is required for the assessment of damages in a section 1983 action. *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (citation omitted); *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003).  The same is true for defendant Jon Gillette who was mistakenly named by plaintiff instead of Edward J. Cermak.

**ORDERED**, that plaintiff's request to amend the amended complaint to remove defendant Gillette and add defendant Cermak (Dkt. No. 50) is **DENIED AS MOOT.**

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.**  *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 6(a), 6(e), 72.

Dated: July 31, 2012

Hon. Andrew T. Baxter
U.S. Magistrate Judge

24